**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

_____

| | | |
|---|---|---|
| GLADYS BAILEY, as the Administratrix | : | |
| of the Estate of DEBBIE BAILEY, | : | C.A. No. 04-1540-GMS |
| deceased, et al | : | |
| | : | |
| v | : | |
| | : | |
| RONALD I. LEBMAN, M.D., et al | : | |

_____

**MEMORANDUM OF LAW FOR PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT CONCERNING
DEFENDANTS' EMTALA VIOLATION**

## I.    INTRODUCTION

This case was filed pursuant to the Emergency Medical Treatment and Active Labor Act

("EMTALA"), 42 U.S.C. §1395dd, as well as pursuant to the Delaware Wrongful Death and

Survival Acts, 10 Del. C. §3724 and 10 Del. C. §3704, by plaintiffs Gladys Bailey, as the

Administratrix of the Estate of Debbie Bailey, Deceased, Dominick Bailey, Demetria Bailey,

Individually and as guardian for Amber Bailey, a minor, and Tia Bailey.

Plaintiffs allege, *inter alia*, that defendants Ronald I. Lebman, M.D. and Bayhealth Medical

Center, Inc., d/b/a Kent General Hospital ("defendants") violated EMTALA and committed medical

negligence on January 19, 2003 during defendants' care and treatment of decedent Deborah Bailey

("decedent").  Specifically, defendants improperly performed a medical screening examination and

provided sub-standard medical care during decedent Debbie Bailey's visit to Bayhealth Medical

Center, Inc., d/b/a Kent General Hospital ("defendant Kent General Hospital") for chest pain.

The instant Motion for Partial Summary Judgment only addresses one of defendants' EMTALA violations. Specifically, defendants' failure to properly provide continuous cardiovascular monitoring in the emergency room during decedent's evaluation for a potential emergency medical condition constituted an EMTALA violation. The facts concerning the hospital's failure to provide continuous cardiovascular monitoring are uncontroverted. Hospital policy, as well as the standard of care and the standard practice at defendant Kent General Hospital, was to provide continuous cardiovascular monitoring for all patients presenting with chest pain. Although such monitoring was initially begun, there are uncontroverted admissions made by employees/agents of defendant Kent General Hospital and by defendant Dr. Lebman, which are confirmed by the sole defense expert, that continuous cardiovascular monitoring was not maintained during the time period during which decedent was being evaluated for an emergency medical condition. The medical records confirm this fact. This uncontroverted improper action was a violation of hospital policies and the hospital's routine practice and is, therefore, an EMTALA violation. There exists no issue of material fact concerning the hospital's policy or lack of cardiovascular monitoring. Consequently, plaintiffs respectfully request that this Court find in their favor on the sole issue as to whether an EMTALA violation occurred.

## II.     FACTUAL BACKGROUND AND PROCEDURAL HISTORY

This EMTALA violation and medical malpractice case is brought on behalf of decedent Debbie Bailey, who died in the emergency room at Kent General Hospital on January 19, 2003 at 41 years of age. Decedent is survived by her mother, Gladys Bailey, who serves as the Administratrix of decedent's estate, as well as her four children, Dominick Bailey, Demetria Bailey, Tia Bailey and Amber Bailey (Amber remains a minor).

On January 19, 2003, decedent presented to the emergency department at Kent General Hospital seeking emergency medical treatment for a potential emergency medical condition manifested by complaints of chest pain, which radiated to her left arm, and shortness of breath.  Ms. Bailey rated her chest pain as a severe 9 out of 10.  She presented to the emergency department at 8:26 p.m. and was brought back into a room at approximately 9:00 p.m. via wheelchair.

Decedent's medical care in the emergency department was the responsibility of defendant Ronald Lebman, M.D. ("defendant Lebman"), who obtained an EKG, which noted abnormalities consistent with an early myocardial infarction.  Decedent was administered sublingual nitroglycerin, which had no affect on her chest pain.  The medical records state that Ms. Bailey was last visualized by a nurse at approximately 9:50 p.m. and that at 10:20 p.m. Ms. Bailey was "found unresponsive," without pulse or respiration.  At the time Ms. Bailey was found unresponsive, she was not being cardiovascularly monitored.  A full resuscitation ensued and Ms. Bailey was pronounced dead at 10:50 p.m.

Procedurally, all discovery in this case has been concluded.  Plaintiffs have disclosed expert reports from five (5) health care providers (physicians and nurses) concerning the issues of an EMTALA violation, liability and damages, as well as an economic report.  Defendants have produced a single expert report from Dr. Ross E. Megargel.  Expert discovery has been completed.  This case is trial ready and trial is scheduled to begin on June 19, 2006.

## III.    STANDARD OF REVIEW

Summary Judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that moving party is entitled to a judgment as a matter of law."  Fed.R.Civ.P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Although

the Court must construe all evidence in a light most favorable to the non-moving party, see Pollock v. Am. Tl. & Tel. Longlines, 794 F.2d 860, 864 (3d Cir. 1986), it is not the role of the Court "to weigh the evidence and determine the truth of the matter, but [only] to determine whether there is a genuine issue for trial."    Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). Consequently, when facts are not controverted, summary judgment is appropriate.

IV.    **ARGUMENT**

A.    **EMTALA Requirements**

The Emergency Medical Treatment and Labor Act ("EMTALA"), 42 U.S.C. §1395dd, establishes requirements for hospitals and physicians for the medical screening and stabilization of patients presenting to a hospital emergency department with a potential emergency medical condition exists.  All patients presenting to a hospital emergency department must be provided a medical screening examination "to determine whether or not an emergency medical condition exists." 42 U.S.C. §1395dd(a).  If the hospital then determines that the individual has an emergency medical condition, the hospital must provide stabilizing treatment for it, if such stabilization is within the capability of the hospital.  42 U.S.C. §1395dd(b).  The instant Motion for partial summary judgment is specifically based upon defendant Kent General Hospital's and Dr. Lebman's obligation to perform an appropriate ongoing medical screening examination during the time period when it was not yet determined if decedent had an emergency medical condition.[1]

EMTALA clearly requires that all patients receive a medical screening examination and the relevant portion of the statute states:

---

[1] EMTALA provides for both administrative and private civil actions for negligent EMTALA violations. See 42 U.S.C. §42 U.S.C. §1395dd(d)(1).

> In the case of a hospital that has a hospital emergency department, if any individual (whether or not eligible for benefits under this subchapter) comes to the emergency department and a request is made on the individual's behalf for an examination or treatment for a medical condition, the hospital must provide for an appropriate medical screening examination within the capability of the hospital's emergency department, including ancillary services routine available to the emergency department, to determine whether or not an emergency medical condition (within the meaning of subsection (e)(1) of this section) exists.

42 U.S.C. §1395dd(a).  The EMTALA Statute defines an "emergency medical condition" as:

> "(A)   a medical condition manifesting itself by acute symptoms of sufficient severity (including severe pain) such that in the absence of immediate medical attention could reasonably be expected to result in  -
>
> (i)    placing the health of the individual (or, with respect to a pregnant woman, the health of her unborn child) in serious jeopardy,
> (ii)   serious impairment to bodily functions, or
> (iii)  serious dysfunction of any bodily organ or part.

42 U.S.C. §1395dd(e)(1).

Although the statute does not define what is meant by an "appropriate screening medical examination," the Courts have generally agreed that an appropriate medical screening examination has two parts.  First, the screening examination should be "reasonably calculated" to identify an emergency medical condition.  See  Correa v. Hospital San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995) (holding that an egregious delay in attending to a patient is the denial of a medical screening examination).  Second, the medical screening examination must be applied in an "even-handed manner."  Id. at 1193.  This means that a medical screening examination procedure must be applied "uniformly to all patients with similar complaints."  Barber v. Hospital Corp. of America, 977 F.2d 872, 879 (4th Cir. 1992).  In effect, an EMTALA violation requires a showing of disparate treatment

between patients with the same or similar complaints.[2]   Additionally, EMTALA imposes "'strict liability' on a hospital which violates [its] [own] requirements." Repp v. Anadarko Municipal Hospital, 43 F.2d 519, 522 (10th Cir. 1994) (holding that an appropriate medical screening examination occurs when a hospital follows its own standard emergency room screening procedures).   Consequently, what defines an "appropriate" medical screening examination is specifically determined "by reference to a hospital's standard screening procedures." Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991).   Therefore, "any departure from a hospital's own standard screening procedures constitutes inappropriate screening and [is a] violation of the Emergency Act [EMTALA.]" Id.   The "refusal to follow regular screening procedures in a particular instant contravenes the [EMTALA] statute." Correa, 69 F.2d at 1192. Furthermore, the hospital's policies or procedures need not be specified in writing, but can be determined by the normal practice of the hospital.   See Summers v. Baptist Med. Center Arkadelphia, 91 F.3d 1132, 1140 (8th Cir. 1996).

Finally, it is important to recognize that a medical screening examination does not occur at a single point in time.   Rather, a medical screening examination includes the entire time period until there is a determination as to whether or not an emergency medical condition exists.   This time period of care includes "available ancillary services through departments such as radiology and laboratory," as well as ongoing observation and assessment. Barber, 977 F.2d at 879 n.6.

---

[2] The disparate treatment required under EMTALA is categorically distinct from faulty treatment, misdiagnosis or medical malpractice, as alleged in this case under Delaware State law.

**B.     Decedent Debbie Bailey Had a Potential Emergency Medical Condition, Which Had Not Been Ruled-Out**

It is uncontroverted that decedent Debbie Bailey presented to defendant Kent General Hospital with chest pain and shortness of breath.  <u>See</u> Kent General Hospital medical record of decedent Debbie Bailey, at p. 1, a copy of which is attached hereto as Exhibit "A."  Moreover, defendant Lebman admitted that he knew decedent had shortness of breath and chest pain.  <u>See</u> Deposition of defendant Ronald Lebman, M.D., dated August 17, 2005, at p. 65, ln. 14-17, a copy of which is attached hereto as Exhibit "B."  Dr. Lebman also admitted that decedent's chest pain was known to persist over time and to radiate to the left arm, which is consistent with a myocardial infarction (heart attack).  <u>Id.</u> at pp. 101-102.  Dr. Lebman also was aware that decedent rated her chest pain as severe and as a nine on a scale of ten.  <u>Id.</u> at p. 88, ln. 10-18.

In making a medical assessment concerning decedent Debbie Bailey's medical condition, defendant Lebman stated in the medical record and during his deposition that he had a concern of a potential acute myocardial infarction (heart attack).  <u>Id.</u> at p. 67, ln. 20-24 and Exhibit "A," at p. 4.  Moreover, at his deposition, Dr. Lebman specifically stated that his history and physical examination did not rule out a myocardial infarction.  <u>See</u> Exhibit "B," at p. 71, ln. 12-15.  Finally, Dr. Lebman admitted that "the potential of acute myocardial infarction [is] an emergency medical condition."  <u>Id.</u> at p. 70, ln. 6-8.

Consequently, the medical records and defendant Lebman's own admission clearly conclude that at the time of decedent's death, she was still being evaluated for a potential emergency medical condition.

C.      **Defendants Admit That Continuous Cardiac Monitoring Was Part of the Hospital's Standard Medical Screening Examination for Chest Pain Patients**

Defendant Kent General Hospital's standard medical screening examination for all patients presenting to its emergency room included continuous cardiovascular monitoring. This fact has been admitted to by multiple employees of Kent General Hospital. Louise McLean, R.N. ("Nurse McLean"), was staff nurse at Kent General Hospital on January 19, 2003. See deposition of Louise McLean, R.N., dated August 18, 2005, p. 7-8, a copy of which is attached hereto as Exhibit "C." Nurse McLean has specifically admitted that it was the routine or general practice that all patients presenting with chest pain be placed on a monitor. Exhibit "C," at p. 16, ln. 6-15. Additionally, Deborah Eberly, R.N. ("Nurse Eberly"), who was the emergency room nurse manager for Kent General Hospital on January 19, 2003, admitted that there were standard practices in place, concerning the care of all patients with chest pain, which were later put into writing. See deposition of Deborah Eberly, R.N., dated August 5, 2005, at p. 134, ln. 5-18, a copy of Nurse Eberly's deposition is attached hereto as Exhibit "D." Nurse Eberly admitted that, after decedent's death, defendant Kent General Hospital memorialized in writing its standard emergency room medical screening examination policies. Id. This chest pain hospital policy included having the patient on a monitor. See defendant Kent General Hospital's chest pain policy, at Treatment Protocol No. 5, a copy of which is attached hereto as Exhibit "E."

Defendant Kent General Hospital's medical screening examination policy for chest pain required, whether it was written or not, that a nurse must "apply cardiac monitor and obtain rhythm strip." See Exhibit "E," at Treatment Protocol No. 5. The "cardiac monitor" is a continuous cardiac rhythm monitoring that allows visualization of the patient's heart rhythm at the patient's bedside, as well as at the central nursing station. This continuous cardiac monitor will alarm for arrhythmias

and will also alarm if the leads are disconnected.  In fact, Nurse Eberly, who is an employee/agent of defendant Kent General Hospital, specifically stated that the heart rhythm "is supposed to be monitored continuously" and that this monitor is "responsible. . . for showing us what's going on. And gives us a baseline to function off of should there be any changes." See Exhibit "D," at p. 136, ln. 10-17.  Consequently, defendant Kent General Hospital has admitted that its standard medical screening exam included continuous cardiac monitoring for all patients with chest pain until a potential emergency medical condition has been excluded.

Moreover, defendant Ronald Lebman, M.D. ("defendant Lebman"), who was the physician responsible for decedent's care at defendant Kent General Hospital, expected that decedent would have been on a cardiac monitor during the entire time she was in the emergency room.  See Exhibit "B," at p. 79, ln. 9-14. Dr. Lebman specifically admitted that "it's painfully obvious in this case . . . that the emergency room evaluation is an ongoing evaluation and that anybody who might be considered at any time to still be at risk for a cardiac event, should be on a cardiac monitor" and that this included decedent Debbie Bailey.  Id. at p. 79, ln. 17 - p. 80, ln. 1.

Dr. Megargel, the defendants' only expert, testified that "the screening process that they give to one patient who presents with cardiac related symptoms has to be the same or substantially similar to another patient who presents with cardiac related symptoms." See Deposition of Ross Megargel, D.O., dated February 16, 2006, at p. 132, ln. 4-10,  a copy of which is attached hereto as Exhibit "F." Dr. Megargel also stated that having decedent on a cardiac monitor "would have been part of an appropriate screening process for her."  Id. at p. 133, ln. 18-23.  Dr. Megargel stated that he was not aware if Kent General Hospital had any policy concerning patients presenting with Debbie Bailey's symptoms.  Id. at p. 134, ln. 1-7.  Dr. Megargel also testified that "being on a cardiac monitor [is] part of the standard screening examination provided to all chest pain patients at Kent

9

General/Bayhealth [Hospital]." <u>Id.</u> at p. 136, ln. 9-18.

Consequently, defendants have admitted that the standard medical screening exam for chest pain patients at Kent General Hospital included continuous cardiac monitoring. Although such continuous cardiac monitoring was initially begun, unfortunately, this continuous cardiac monitoring did not continue throughout decedent's emergency room care.

### D.    Continuous Cardiac Monitoring Was Discontinued

Although continuous cardiac monitoring was initiated, the uncontroverted evidence and admissions of defendants demonstrate that this cardiac monitoring was discontinued. As an initial matter, defendant Lebman admitted that it was his understanding that the "cardiac monitor was silenced." <u>See</u> Exhibit "B," at p. 30, ln. 21 - p. 31, ln. 1. Additionally, Nurse Eberly admitted that there was "lack of monitoring because that alarm was turned off, ongoing assessment wasn't provided for that time period, that lack of time period that she was found." <u>See</u> Exhibit "D," at p. 127, ln. 8-12. Additionally, Nurse Eberly stated that Nurse Lisa Little ("Nurse Little"), who was also an employee/agent of defendant Kent General Hospital, told Nurse Eberly that "she was concerned because alarm status on the monitor had been turned off at the central station." <u>See</u> Exhibit "D," at p. 16, ln. 18-20. Conversely, Nurse Little has stated that Nurse Eberly told her that the monitor "at the nurses station was turn off." Deposition of Lisa Little, R.N., dated June 24, 2005, at p. 158, ln. 4-9, a copy of which is attached hereto as Exhibit "G."

Finally, Delaware Health and Social Services' Office of Health Facilities Licensing and Certification investigated Kent General Hospital and its care as it specifically related to decedent Debbie Bailey. The State of Delaware concluded that defendant Kent General Hospital was out of compliance with several regulations and that the cardiac monitor was silenced or had its alarm

suspended, resulting in changes in decedent's cardiac rhythm not being detected.  <u>See</u> letter and report from Delaware Health and Social Services' Office of Health Facilities Licensing and Certification,  a copy of which is attached hereto as Exhibit "H."

In corroboration to all the admissions of defendants, defendants' sole medical expert, Dr. Megargel testified under oath that "until an MI is actually ruled out, the patient needs to be on a cardiac monitor." <u>See</u> Exhibit "F," at p.112, ln. 2-5.  Moreover, Dr. Megargel testified that decedent "wasn't monitored for a period of time." <u>Id</u>. at p. 123, ln. 16-19.  Dr. Megargel also testified that at the time of decedent's cardiac arrest, "the general screening process had not yet completed," <u>Id.</u> at p. 128, ln. 19-23 and that decedent "was having chest pain.  She was being screened.  Her screening process was not completed." <u>Id.</u> at p. 131, ln. 12-14.[3]

The limited Kent General Hospital emergency room medical records confirm that decedent was not monitored during the time period preceding her cardiac arrest.  The last documented contact with decedent was at 21:50, when she was given some oral medication by a nurse. See Exhibit "A," at p. 2.  However, these medical records then simply state that at 22:20 decedent was "found unresponsive." <u>Id</u>.  When defendant Kent General Hospital attempted to determine if there was a record of decedent's continuous cardiac monitoring during the time period prior to her arrest, Nurse Eberly, the emergency department nurse manager, concluded: "we went back in the memory - we

---

[3] Dr. Megargel does offer a "net opinion" in his expert report claiming that there was no EMTALA violation.  <u>See</u> Expert Report of Dr. Megargel, at ¶ 4, a copy of which is attached as Exhibit "I."  However, Dr. Megargel admitted during his deposition each of the individual components necessary to have an EMTALA violation, as discussed herein.  Because Dr. Megargel's "net opinion" is not based on the facts of this case, it should be rejected by the Court.  <u>See</u> <u>Miller v. U.S.</u>, _____ F.Supp 2d _____; 2006 WL 782850, *3 (D. Del. 2002) (holding that a "net opinion" not based on reliable information should be excluded pursuant to F.R.E. 702 and 703, as well as under <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993).  In addition, Dr. Megargel specified at his deposition that his opinion concerning the lack of an EMTALA violation only applied to defendant Lebman.  <u>See</u> Exhibit "F," at p. 68, lines 6-14.

In contrast, plaintiffs' experts clearly articulate a proper foundation for their opinion that an EMTALA violation occurred.  <u>See</u>, <u>e.g.</u>, Expert Report of Albert Weihl, M.D., dated September 29, 2005 and Expert Report of Mark Hastings, R.N., dated November 14, 2005, copies of which are attached hereto as Exhibits "J" and "K," respectively.

couldn't retrieve the information." <u>See</u> Exhibit "D," at p. 114, ln. 21-24. The information on this continuous cardiac monitoring simply did not exist, because no cardiac monitoring was being done during this time period.

     **E.**     **All the Elements of an EMTALA Violation Have Been Satisfied by the <u>Uncontroverted Evidence and Admissions of Defendants.</u>**

As detailed above, decedent presented with signs and symptoms consistent with a potential emergency medical condition, namely a life-threatening heart attack. These symptoms included, *inter alia*, severe constant left chest pain, which radiated to the left arm, shortness of breath, nausea, and an abnormal electrocardiogram (EKG). It is undisputed that decedent was being evaluated in defendant Kent General Hospital's emergency room for a potential acute myocardial infarction (heart attack), which is an emergency medical condition, as admitted to by defendant Lebman. <u>See</u> Exhibit "B," at pp. 67-70. The possibility of an acute myocardial infarction had not been ruled-out by Dr. Lebman's initial evaluation. <u>Id.</u> at p. 71, ln. 12-14.

It is also undisputed that defendant Kent General Hospital's standard screening medical examination for all patients presenting with chest pain entailed continuous cardiac monitoring until a potentially life-threatening condition was ruled-out. Moreover, defendants have admitted that the continuous cardiac monitoring was silenced, suspended or turned-off. The record is undisputed that defendant Kent General Hospital and Dr. Lebman failed to follow their own standard medical screening examination. There exists no issue of material fact concerning the hospital's policy regarding continuous monitoring and/or the failure to perform such monitoring on decedent. Consequently, all the elements of an EMTALA violation have been satisfied and the law is unambiguous that such a failure to follow the hospital's own policy is a violation of EMTALA.

**V.    CONCLUSION**

For all the reasons discussed herein, plaintiffs respectfully request that the Court grant Plaintiffs' Motion for Partial Summary Judgment and enter the attached proposed Order stating that defendants committed a violation of the EMTALA Statute.

Respectfully submitted,

**POTTER, CARMINE, LEONARD &
AARONSON, P.A.**

BY:<u>S/ STEPHEN POTTER, ESQUIRE</u>
    STEPHEN POTTER, ESQUIRE
    840 North Union Street
    Post Office Box 514
    Wilmington, Delaware 19899
    (302) 658-8940
    Attorney for Plaintiffs

**KLINE & SPECTER
A Professional Corporation**

BY:    _____
    THOMAS R. KLINE, ESQUIRE
    LEON AUSSPRUNG, ESQUIRE
    JOSHUA VAN NAARDEN, ESQUIRE
    Attorneys for Plaintiffs
    Nineteenth Floor
    1525 Locust Street
    Philadelphia, Pennsylvania 19102
    (215) 772-1000

Dated: May 5, 2006