IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| GLADYS BAILEY, as the Administratrix of the Estate of DEBBIE BAILEY, deceased, et al<br><br>v<br><br>RONALD I. LEBMAN, M.D., et al | :<br>:    C.A. No. 04-1540-GMS<br>:<br>:<br>:<br>:<br>: |

## JOINT PRETRIAL ORDER

I.    **STATEMENT AND NATURE OF THE ACTION**

    **A.**    **Plaintiffs**:

This is a medical negligence and EMTALA case in which plaintiff seeks compensatory and punitive damages for injuries to, and death of, Debbie Bailey, which was caused by defendants, Ronald Lebman, MD ("Lebman") and Kent General/Bayhealth ("Bayhealth"). On January 19, 2003, decedent Debbie Bailey ("Mrs. Bailey") came to the Emergency Department at Defendant Kent General/Bayhealth ("Bayhealth") seeking emergency medical treatment for an emergency medical condition manifested by complaints of chest pain and shortness of breath, as well as nausea. In addition to the reporting of the acute onset of severe chest pain, Mrs. Bailey rated her chest pain as an 8 out of 10. Mrs. Bailey's chest pain was unchanged after the administration of nitroglycerine. Defendants recklessly intentionally turned off decedent's cardiac monitor and she was left in an examination room without observation until she was "found unresponsive" 35 minutes after last being seen.

    Plaintiff alleges that the defendants were reckless and negligent in their care and treatment of the plaintiff, by failing to properly and adequately treat the plaintiff for the condition from which she was suffering on January 19, 2003. The Defendants also recklessly employed inadequate and/or

inappropriate methods, techniques, and procedures in the care and treatment of the plaintiff and failed to take proper measures to determine whether she was suffering from a myocardial infarction ("MI").  In direct violation of 42 U.S.C.A. §1395dd the defendants recklessly and intentionally failed to appropriately screen and administer care to Debbie Bailey and treated her differently then similarly situated patients who present with complaints of chest pain.  Most notably, the cardiac monitor, that was supposed to be monitoring Debbie Bailey's cardiac rhythm, was intentionally silenced and shut off such that appropriate monitoring could not be achieved.

The Defendants were jointly and severally negligent and careless in failing to timely and properly evaluate, monitor and treat Plaintiff's medical condition and also failing to perform an appropriate screening examination and /or stabilize decedent's emergency medical condition in violation of the EMTALA statutes, all of which ultimately caused Plaintiff to suffer severe injuries and die.

**B.    Defense:**

The decedent Debbie Bailey came to the Emergency Department at Kent General Hospital in Dover, Delaware, on January 19, 2003 at 8:26 p.m. with a complaint of shortness of breath all week and chest pain and was initially evaluated by a triage nurse at 8:31 p.m. and found to have normal vital signs and adequate oxygenation, although she would not allow her temperature to be taken.  Shortly before 9:00 p.m., she was brought to a bed in the treatment area and an EKG was administered to check for possible cardiac problems.

The EKG was reviewed by Dr. Lebman and the patient reported that her pain was getting better.  At 9:10 p.m., blood work was obtained and sent to the lab and an IV started and the patient was placed on a cardiac monitor.  Dr. Lebman's formal examination of the patient was documented

at 9:25 p.m. and on his order nitroglycerin was given at 9:29 p.m. with a second dose being administered at 9:35 p.m. The patient reported no relief from her chest pain with nitroglycerin and Dr. Lebman ordered a GI cocktail which can relieve symptoms of gastrointestinal distress which oftentimes cause chest pain. This was given at 9:50 p.m.

During the time the cardiac monitor was applied to Ms. Bailey, she removed the leads on several occasions, requiring the nurses to respond and reapply the leads. The removal of the leads would cause a leads-off alarm to sound. At some point, someone silenced the leads-off alarm on Mrs. Bailey's monitor. Bayhealth acknowledges that this was inappropriate. The patient was found unresponsive at 10:20 p.m. and an attempted resuscitation, the propriety of which is not challenged, was unsuccessful. On post-mortem examination, the patient was found to have a left coronary artery that was narrowed to pinpoint size.

While Bayhealth acknowledges that the silencing of the leads-off alarm was inappropriate, it denies that it can be stated with medical probability that this caused the patient's death or, stated otherwise, that the patient's death was preventable within terms of reasonable medical probability. Defendants also deny that Bayhealth violated EMTALA, the anti-dumping statute, which is the predicate of this Court's jurisdiction in this matter.

**II.     CONSTITUTIONAL OR STATUTORY BASIS OF FEDERAL JURISDICTION**

This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. §1331. Venue is in the District of Delaware pursuant to 28 U.S.C. § 1391(b) because all defendants are residents of this judicial district and the events or omissions giving rise to the claim occurred in this judicial district.

Defendants acknowledge that plaintiffs have pled a theory of liability which would give this Court jurisdiction; defendants have denied that theory and the jurisdiction of this Court which is

premised upon that theory.

### III.  STATEMENT OF FACTS WHICH ARE ADMITTED

By Plaintiffs:

1. At approximately 8:26 p.m. on January 19, 2003, Mrs. Bailey presented to the Emergency Department at defendant Bayhealth complaining of shortness of breath and chest pain.

2. Mrs. Bailey was "triaged" at 8:31 p.m. and brought back into a room in the Emergency Department at defendant Bayhealth at approximately 9:00 p.m. via wheelchair.

3. At approximately 9:00 p.m., an EKG was reviewed by defendant Lebman, an Emergency Department physician at defendant Bayhealth, who noted abnormalities on the EKG.

4. While Mrs. Bailey was a patient in the Emergency Department of defendant Bayhealth, defendant Lebman was the physician responsible for her medical care.

5. At approximately 9:29 p.m., sublingual nitroglycerine was administered without any change noted in Mrs. Bailey's chest pain. At approximately 9:45 p.m., repeat sublingual nitroglycerine was given and again Mrs. Bailey noted no change in her chest pain.

6. At 9:35p.m., Mrs. Bailey's blood pressure was noted to be 124/73 and a second dose of sublingual nitroglycerine was given. At 9:45p.m., it was noted that Mrs. Bailey had no change in her chest pain, but her blood pressure had decreased to 102/56.

7. At approximately 10:20 p.m., Mrs. Bailey was "found unresponsive" and without pulse or respiration and attempts at resuscitation were unsuccessful; Mrs. Bailey was pronounced dead at 10:50 p.m. on January 19, 2003.

8. At the time that Mrs. Bailey was "found unresponsive," the cardiac monitor had been intentionally silenced.

    Defendants object to the word "intentionally" in plaintiffs' paragraph (8).

9. On October 8, 2003, the Delaware Health and Human Services conducted a closed clinical record review, staff interview and document review where it was determined that the registered nurse failed to supervise and evaluate the nursing care provided to Debbie Bailey in accordance with acceptable standards of practice.

    Defendants object to plaintiffs' paragraph (9) as written.

4

10. On October 8, 2003, the results of the Delaware Health and Human Services investigation found that Bayhealth failed to meet the emergency needs of Debbie Bailey, who had complaints of chest pain, in accordance with acceptable standards of nursing practice. This was demonstrated by failure of staff: a) to evaluate Debbie Bailey when the central cardiac monitor alarm at the Emergency Department nurse's station indicated a change in cardiac rhythm, b) to assess the effectiveness of medications administered for Debbie Bailey's complaints of chest pain, c) to monitor Debbie Bailey's decreasing blood pressure and d) to develop policies regarding the management of chest pain in the Emergency Department setting.

Defendants object to plaintiffs' paragraph (10).

**By Defendants:**

The postmortem examination conducted by the State Medical Examiner found that Ms. Bailey's left coronary artery was narrowed to pinpoint size for 0.5 centimeters.

IV. **STATEMENT OF ISSUES OF FACT WHICH ANY PARTY CONTENDS REMAIN TO BE LITIGATED**

   A. **Plaintiff intends to prove the following contested facts with regard to liability:**

   1. On January 19, 2003, at approximately 9:00 p.m. Debbie Baily's EKG revealed findings consistent with the early electro cardiographic changes seen in an acute myocardial infarction.

   2. On January 19, 2003, at approximately 10:20 p.m., Mrs. Bailey is "found unresponsive" and was not being properly monitored or being attended to by any hospital personnel.

   3. Debbie Bailey was not placed on oxygen at any time prior to the administration of cardiopulmonary resuscitation.

   4. Cardiac monitoring and oxygen are integral parts of a proper EMTALA medical screening examination and are also required by the standard of care.

   5. Debbie Bailey's injuries and death would have been prevented if the defendants had properly and appropriately monitored and treated her condition upon presentation to Bayhealth.

   B. **Defendants intends to prove the following contested facts with regard to liability:**

   (1) There was no breach of the standard of care by Dr. Lebman.

5

    (2)    It cannot be proved within terms of reasonable medical probability that any different medical treatment of Ms. Bailey would have altered the outcome.

    (3)    There was no EMTALA violation by Bayhealth.

## V. STATEMENT OF ISSUES OF LAW WHICH ANY PARTY CONTENDS REMAIN TO BE LITIGATED

**A. Plaintiff intends to prove the following contested issues of law with regard to liability:**

1. Defendants' violated § 1395dd(a) of EMTALA by failing to afford Mrs. Bailey an appropriate medical screening examination on January 19, 2003, in order to determine whether an emergency medical condition existed

2. Defendants failed to conduct a full and complete medical screening examination on Debbie Bailey.

3. Defendants performed an inadequate triage examination without an appropriate complete medical screening examination.

4. Debbie Bailey was treated disparately from other similarly situated patients.

5. Defendants departed from their standard medical screening examination of patients with complaints and symptoms similar to those of Mrs. Bailey.

6. Defendants failed to timely determine whether or not an emergency medical condition existed.

7. Defendants failed to adhere to their own standard policies, procedures and/or protocols for patients entering the Emergency Department in similar medical circumstances.

8. Defendants failed to perform a medical screening examination within the capabilities of the defendant hospitals' Emergency Department and ancillary services.

9. Defendants' conduct exhibited a willful, reckless and/or conscious disregard of, or reckless and/or conscious indifference to, the rights, safety and health of Mrs. Bailey under circumstances where the probability of harming Mrs. Bailey by engaging in such conduct was known, or should have been known, by the defendants.

10. Defendants' conduct fell below the standard of care and/or was intentional and/or reckless.

11. All of the above caused decedent's injuries and death.

6

B.  **Defendants intends to prove the following contested facts with regard to liability:**

(1) Defendants dispute that plaintiff's listing constitutes a Statement of Legal Issues to be litigated.

(2) What is the purpose and requirement of EMTALA as applied to an Emergency Department presentation such as that of Ms. Bailey?

(3) Whether plaintiff should be entitled to call three expert nursing witnesses whose testimony appears identical and cumulative when defendant is not disputing that it was inappropriate to silence the leads-off alarm.

(4) Whether defendants' post-incident investigation and attempts at re-mediation are relevant and admissible under FRE 407.

(5) Whether the economic calculation proffered by David Hopkins is reliable and admissible under FRE 702 and 703

(6) Whether the trial should be bifurcated so that the jury first determines whether or not an EMTALA violation occurred to determine whether this Court has jurisdiction of this matter.

VI. **PRE-MARKED EXHIBITS**

A.  **Plaintiff's Exhibits:**

1. Debbie Bailey's January 19, 2003, Bayhealth Medical Records.

2. October 8, 2003, Delaware Health and Social Services, Office of Health Facilities Licensing and Certification (OHFLC) survey report and Bayhealth response.

3. April 5, 2004, Letter from Cindy Jester to Gladys Bailey.
4. Root Cause Analysis #34768.
5. Deposition Transcript of Gladys Bailey
6. Deposition Transcript of Demetria Bailey.
7. Deposition Transcript of Tia Bailey.
8. Deposition Transcript of Dominick Bailey.
9. Deposition Transcript of Paul Emery, M.D.
10. Deposition Transcript of Ronald Lebman, M.D.
11. Deposition Transcript of Louise McLean, R.N.
12. Deposition Transcript of Charles Pozner, M.D.
13. Deposition Transcript of Albert C. Weihl, M.D.
14. Deposition Transcript of George Rudloff.
15. Deposition Transcript of Cindy Jester, R.N.

7

16. Deposition Transcript of Ross E. Megargel, M.D.
17. Deposition Transcript of Lisa Little, R.N.
18. Deposition Transcript of Deborah Eberly, R.N.
19. Deposition Transcript of Joann Davis.
20. Expert Report of Kathleen Ashton, Ph.D.
21. Curriculum Vitae of Kathleen Ashton, Ph.D.
22. Expert Report of Mark Hastings, R.N.
23. Curriculum Vitae of Mark Hastings, R.N.
24. Expert Report(s) of Kathleen Hirsch, R.N., MSN
25. Curriculum Vitae of Kathleen Hirsch, R.N., MSN
26. Expert Economic Report of David Hopkins, ASA
27. Curriculum Vitae of David Hopkins, ASA
28. Expert Report of Charles Pozner, M.D.
29. Curriculum Vitae of Charles Pozner, M.D.
30. Expert Report of Albert Weihl, M.D.
31. Curriculum Vitae of Albert Weihl, M.D.
32. Anatomical pictures of heart.
33. January 20, 2003, Autopsy Report of Debbie Bailey.
34. Blow up of the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. § 1395dd.
35. Defendant Emery's Answer to Plaintiffs Complaint.
36. Defendant Lebman's Answer to Plaintiffs Complaint.
37. Defendant Bayhealth's Answer to Plaintiffs Complaint.
38. Photographs of Plaintiff Debbie Bailey, Dec'd.

**B.    Defendants' Exhibits:**

With respect to Section 6, defendants' position as to plaintiffs' proposed exhibits is as follows:

(1)    No objection;
(2)    Objection - relevance;
(3)    Objection - relevance;
(4)    Objection - relevance;
(5)-(19) Objection
(20)    Objection - hearsay;
(21)    No objection if witness is permitted to testify;
(22)    Objection - hearsay;
(23)    No objection if witness is permitted to testify;
(24)    Objection - hearsay;
(25)    No objection if witness is permitted to testify;
(26)    Objection - hearsay and FRE 702-3;
(27)    No objection if witness is permitted to testify;
(28)    Objection - hearsay;
(29)    No objection;
(30)    Objection - hearsay;
(31)    No objection;

8

(32) This exhibit has not been produced and will be reviewed and initialed by counsel;
(33) No objection;
(34) Objection - relevance;
(35) Objection - relevance;
(36) Objection - relevance;
(37) Objection - relevance;
(38) Objection - relevance and non-production.

Defendants list the following Exhibits:

(1) Kent General Hospital Emergency Department records, 1/19/03;
(2) Records of Ms. Bailey's prior presentations to and treatment at Kent General Hospital;
(3) CV of Ronald Lebman, M.D.;
(4) CV of Ross Megargel, D.O.;
(5) Medical records of Jack R. Milligan, M.D.

## VII.   WITNESSES LIST

### A.   Plaintiffs' Witness List:

1. Gladys Bailey (Plaintiff)
   White Oak Condominums
   1001 White Oak Road - Apt. K-12
   Dover, DE 19901

2. Demetria Bailey (Plaintiff)
   539 Millchop Lane
   Magnolia, DE 19962

3. Dominick Bailey (Plaintiff)
   539 Millchop Lane
   Magnolia, DE 19962

4. Tia Bailey (Plaintiff)
   539 Millchop Lane
   Magnolia, DE 19962

5. Amber Bailey (Plaintiff)
   539 Millchop Lane
   Magnolia, DE 19962

6. Ronald Lebman, M.D. (Defendant)
   10 Surrey Road
   Rehoboth Beach, Delaware 19971

7.  Paul Emery, M.D.                (Defendant)
    c/o KENT GENERAL HOSPITAL
    640 South State Street
    Dover, Delaware 19901

8.  Cindy Jester                    (Fact Witness)
    Delaware Health and Social Services
    2055 Limestone Road
    Wilmington, DE

9.  George Rudloff                  (Fact Witness)
    c/o KENT GENERAL HOSPITAL
    640 South State Street
    Dover, Delaware 19901

10. Joann Davis                     (Fact Witness)
    c/o KENT GENERAL HOSPITAL
    640 South State Street
    Dover, Delaware 19901

11. Lisa Little, R.N.               (Fact Witness)
    c/o KENT GENERAL HOSPITAL
    640 South State Street
    Dover, Delaware 19901

12. Louise McLean, R.N.             (Fact Witness)
    c/o KENT GENERAL HOSPITAL
    640 South State Street
    Dover, Delaware 19901

13. Debbie Eberly, R.N.             (Fact Witness)
    c/o KENT GENERAL HOSPITAL
    640 South State Street
    Dover, Delaware 19901

14. Kathleen Ashton, Ph.D.          (Plaintiffs' Expert: Nursing)
    834 Oakwood Drive
    Hammonton, NJ 08037

15. Mark Hastings, R.N.             (Plaintiffs' Expert: Nursing)
    17 Peirce Lane
    Wilton, NH 03086

16. Kathleen Hirsch, R.N., MSN      (Plaintiffs' Expert: Nursing)
    1820 Arlington Drive
    Williamstown, NJ 08094

17.    David Hopkins, ASA    (Plaintiffs' Expert: Actuarial)
       182 East DeKalb Pike
       King of Prussia, PA  19406

18.    Charles Pozner, M.D.    (Plaintiffs' Expert: Emergency Medicine)
       328 Brookline Street
       Newton Center, MA 02159

19.    Albert C. Weihl, M.D.    (Plaintiffs' Expert: Surgery, Emergency
       464 Congress Avenue     Medicine)
       New Haven, CT 06519

**B.   Defendants' Witness List:**

(1)   Defendants reserve the right to call any properly identified witnesses listed by plaintiffs;

(2)   Jack R. Milligan, M.D. - treating physician;
     Plaintiffs object based on relevance.

(3)   Ross E. Megargel, D.O. (expert - emergency medicine);

(4)   Judith G. Tobin, M.D. (fact witness - postmortem examination findings);
     Plaintiffs object to extent any expert opinions offered.

(5)   James Smalley, R.N.
     Plaintiffs object based on relevance.

## VIII. STATEMENT OF WHAT PLAINTIFF INTENDS TO PROVIDE IN SUPPORT OF CLAIMS

Plaintiffs have served reports from six (6) experts setting forth the bases of liability, causation and damages. Relevant portions of these reports are identified below:

### A. Albert C. Weihl, M.D.

**Dr. Weihl is board certified in Emergency Medicine, Internal Medicine with a subspecialty in Endocrinology and Metabolism. Dr. Weihl is presently an Assistant Clinical Professor of Emergency Medicine for the Department of Surgery and Internal Medicine at Yale University School of Medicine. Dr. Weihl states in his September 29, 2005 report as follows:**

> The following deviations from the standard of care are evidence in the care rendered to Ms Debbie Bailey:
>
> 1. Failure by the nurses to triage the patient to an emergency treatment area immediately upon her presentation, within 5 minutes of her arrival with complaints of chest pain and shortness of breath that MUST be assumed to be of cardiac origin in this patient.
> 2. Failure by the nurses and Dr. Lebman to place the patient on oxygen therapy.
> 3. Failure by the nurses and Dr. Lebman to maintain the patient on a cardiac monitor with alarms enabled.
> 4. Failure by the nurses to have the patient assessed by a physician immediately upon her placement in a treatment area within the Emergency Department.
> 5. Failure by Dr. Lebman to perform a repeat EKG in view of the technical limitations of the first EKG, and abnormalities seen of the first EKG.
> 6. Failure by Dr. Lebman to act appropriately in view of the abnormalities seen in the first technically limited EKG that strongly suggested cardiac ischemia in this patient at risk for same.
> 7. Improper administration of Ativan, a non-analgesic sedative, to this patient for treatment of her chest pain by Dr. Lebman, when administration of an analgesic such as morphine sulfate with sedative properties was required in light of the patient's lack of pain relief after administration of nitroglycerine.
> 8. Failure by the nurses and Dr. Lebman to observe and monitor this patient for her response to treatment for the 30 minutes between 9:50 PM and 10:20 PM at which time she was found without vital signs.
>
> Deviations numbers 1-4 also are violations of the EMTALA statute applying to patient with an Emergency Medical Condition, which Ms. Bailey clearly presented with complaints of chest pain and shortness of breath.
>
> * * * *
>
> Had Ms. Bailey been diagnosed and treated in conformance with the

standard of care, she would have survived her hospitalization in January 2003, and would have looked forward to a life expectancy of approximately 25 - 30 years.

B.   **Charles Pozner, M.D.**

**Dr. Pozner is board certified in Emergency Medicine and Internal Medicine. Dr. Pozner is presently an Assistant Professor of Medicine at Harvard Medical School. Dr. Pozner states in his September 30, 2005 report as follows:**

1.   **Deviation of Standard of Care for patients presenting with chest pain and shortness of breath.**

Chest pain and shortness of breath can be the presenting complaint of a wide spectrum of diagnoses, from the life threatening to the benign. In emergency medicine, the first priority of the treating clinician is to treat and/or rule out life-threatening causes, leaving other more benign causes to be sorted out over time. Given the potential life threatening nature of Ms. Bailey's chief complaint, especially in light of her underlying diagnosis of diabetes mellitus, triaging her to the waiting room, employing a classification system that could have led to a four hour wait, was inappropriate. Standard of care would have been to have Ms. Bailey urgently brought back to the ED, where she should have been placed on a cardiac monitor, started on oxygen therapy (which was never done while in the ED until she was being resuscitated), had a diagnostic EKG performed and red by an appropriate physician.

Once in the ED treatment area, the treating physician, Dr. Lebman, should have promptly evaluated Ms. Bailey in order to further assess the etiology of her chief complaint and begin treatment to avert potential worsening of any life threatening diagnosis. Having interpreted her EKG as possibly representing coronary ischemia, Dr. Lebman was clearly concerned that Ms. Bailey was suffering from an acute coronary syndrome (ACS). Despite this, ti took 29 minutes for the patient to receive treatment with nitroglycerin and aspirin. Standard of care would have included prompt administration of oxygen, nitroglycerin, aspirin, and beta blockers. There was no evidence in the medical record that oxygen was administered in contradiction to stated hospital policy, as per testimony in deposition. A repeat EKG should have been obtained within a short period fo time in order to reevaluate for changes indicative of myocardial ischemia; which might have been missed on the initial EKG due to the dynamic electrocardiographic changes that may occur in the setting of an ACS. Continued chest pain in the setting of presumed ACS should have resulted in the consideration of the initiation of heparin, glycoprotein 2B/3A inhibitors, intravenous heparin, further diagnostic studies including bedside echocardiogram, and/or emergent cardiac catheterization. A cardiology consult should also have ben considered. Morphine sulfate should have been considered as an alternative had nitrates not relieved her pain. Ms. Bailey, whose odd behavior was thought by the clinicians caring

13

for her to be related to a possible drug ingestion (which was not found to be the case on post-mortem), was most likely related to her underlying sense that she had a premorbid condition. Pain control with morphine would have been a humane addition to Ms. Bailey's care to treat her conscious pain and suffering. All of these failures by Dr. Lebman and the staff caring for Ms. Bailey constituted deviations in the standard of care for patients presenting with chest pain and shortness of breath thought to be due to myocardial ischemia.

Although there was no evidence of mural rupture or infarction on the gross and microscopic specimens on autopsy, the findings of interstitial fibrous connective tissue, particularly surrounding the blood vessels, as well as severe concentric stenosis in the distal left anterior descending artery, are consistent with a milieu of microvascular ischemia leading to arrhythmia in a diabetic patient.

2. **The intentional and reckless discontinuation of central monitoring in a patient at risk for cardiac arrhythmia or other decrement in condition.**

One of the major responsibilities of an emergency department is to monitor for changes in the condition of patients under their care. This may include, among other interventions, repeating vital signs, obtaining a repeat EKG, or placing a person on a centrally alarmed monitor. In a patient with ACS, one of the leading causes of early death is the development of a life-threatening arrhythmia. This is the reason patients with possible ACS are placed on a monitor that will alarm if an arrhythmia develops. Ms. Bailey ultimately developed ventricular fibrillation. Due to an ED staff member's intentional and wanton disregard for the safety of Ms. Bailey, this eminently treatable arrhythmia went unnoticed until she had a refractory dysrhythmia. In addition, had central monitoring been continued, earlier and less detrimental arrhythmias could have ben discovered, leading to interventions that may have avoided the development of ventricular fibrillation. Data exist that support that the longer one is in ventricular fibrillation without defibrillation; there is an absolute decrease in the chance for successful defibrillation. In fact, it is commonly stated that, "for every minute of VF, one loses approximately 10% chance of return of spontaneous circulation. Had Ms. Bailey been kept on the monitor, and the alarms been responded to, she would almost certainly been found earlier in her course of VF, leading to a significantly increased chance of survival.

Had the proper standard of care been met, as described in #'s 1 and 2, any myocardial injury that may have resulted would have been detected in a timely manner, and proper intervention taken place. The failures to detect, treat, and intervene in a timely manner of this potentially fatal presentation, to a reasonable degree of medical probability, were a cause of her death.

C.   **Mark Hastings, R.N.**

14

**Mark Hastings, R.N. is a staff Registered Nurse in the Emergency Department of Southern New Hampshire Medical Center and Regional Trauma Center in Nashua, NH. Mr. Hastings is also a Clinical Preceptor in emergency department health care, teaching paramedic interns and nursing students. Mr. Hastings states in his November 14, 2005 report as follows:**

> The ED nurses and Dr. Lebman deviated from the standard of care, violated the EMTALA statute and acted in a reckless, careless manner as follows:
>
> 1. Failing to properly administer Oxygen to Ms. Bailey as required by hospital policy;
> 2. Intentionally and purposefully silencing Ms. Bailey's cardiac monitor contrary to hospital policy;
> 3. Failing to appropriately screen Ms. Bailey for a medical condition upon request within the capability of the ED;
> 4. Failure to appropriately identify the emergent medical needs of Ms. Bailey within the capability of the ED;
> 5. Failing to appropriately utilize all available ancillary services and equipment;
> 6. Failing to appropriately stabilize the emergent medical condition of Ms. Bailey within the capability of the ED;
> 7. Treating Ms. Bailey different from other similarly situated patients.
>
> It is my opinion, within a reasonable degree of clinical and nursing probability that the Bayhealth Medical Center and its emergency department, deviated from the accepted standards of care for the patient with chest pain. These deviations were direct causes in bringing about the conscious pain, suffering and death of Ms. Bailey.

D.    **Kathleen Hirsch, RN, MSN, MBA, CEN**

**Kathleen Hirsch, R.N. is a certified Emergency Nurse. Ms. Hirsch is presently an Assistant Chief Nursing Officer at Memorial Hospital of Salem County, Salem, NJ. Ms. Hirsch states in her September 27, 2005 report as follows:**

> The statement alone of chest pain and shortness of breath combined with the risk factor of diabetes mellitus should have triggered a high index of suspicion that her presentation indicated a cardiac emergency. In the context of her emergent presentation this marks a deviation from the standard of care. Even after it was noted at 8:35pm that Ms. Bailey was hollering and spitting in the lobby, which may have been a manifestation of acute pulmonary edema, it appears that she was left in the lobby and interviewed by a registrar at 8:46pm. This caused a delay in Ms. Bailey getting definitive emergency care.
>
> * * * *
>
> There is no documentation of how the patient appeared such as skin, breathing

15

pattern and effort or of a chest auscultation to assess lung sounds.

* * * *

Throughout the progression of Ms. Bailey's care, which included encounters with five registered nurses, there is no adequate documentation of how the patient appeared and assessment of any body systems, which is below the standard of care. Oxygen, which is a primary treatment in chest pain, was never administered in any form until the resuscitation period, despite being required by the standard of care and hospital policy.

* * * *

Between 9:50 pm and 10:20 when Ms. Bailey was found in cardiopulmonary arrest she was not reevaluated for her response to pain medication a review of her cardiac rhythm or any other systems assessment all, which is required by the standard of care. Ms. Bailey was obviously being worked-up as if a cardiac emergency was suspected however, the assessments provided to her were not in accordance with the standard of care that is customarily applied for the frequency and comprehensiveness of reassessment and stabilization.

A gross deviation from the standard of care and hospital policy was further demonstrated in failure to provide continuous cardiac monitoring. First, in the obvious failure to have a person continuously visualizing the monitor and second that the alarm on the monitor had been shut off at the nurses' main monitor at the nurses' station. The mechanism required to silence the monitor took intentional directed actions that are specific to only one monitor. Disabling the monitor was an act of willful indifference to the safety and welfare of Ms. Bailey and directly causing her injuries and death.

Bayhealth Medical Center failed to assure the provision of an appropriate medical screening exam to Ms. Bailey. The comprehensive medical screening exam sufficient to identify an emergency medical condition was not provided to Ms. Bailey as per the standard of care and hospital policy. Miss Bailey was treated different than other similarly situated chest pain patients. Further, the willful act of disabling the alarm on the monitor that was in place to announce changes in Ms. Bailey's cardiac rate or rhythm was a provision of disparate care due to that fact that only the one alarm had been intentionally singled out and silenced.

All the above-discussed failures are deviations from the standard of care regarding the medical care of Debbie Bailey by the nursing staff of Bayhealth Medical Center as well as Bayhealth Medical Center itself, were direct causes of Ms. Bailey's injuries. I hold all the above opinions to a reasonable degree of medical probability/certainty.

D.     **David L. Hopkins, ASA, MAAA**

**David L. Hopkins, ASA, is an economist and is certified in actuarial science. Mr. Hopkins states in his September 30, 2005 report as follows:**

### Summary

### Future Net Lost Income

The Summary figures presented below include the respective amounts of Past Lost Net Income, Future Lost Net Income, Past Lost Household Services, and Future Lost Household Services.

### Net Lost Income

|  | $3,000/yr | $6,000/yr | $9,000/yr |
|---|---|---|---|
| Work through age 55 . . . . . | $167,914 | $203,673 | $239,432 |
| Work through age 60 . . . . . | $179,445 | $226,736 | $274,026 |
| Work through age 65 . . . . . | $189,889 | $247,624 | $305,359 |
| Work through age 70 . . . . . | $199,349 | $266,544 | $333,738 |

**E.     Cindy L. Jester, MSN, RN**

**Cindy Jester, MSN, RN is a Compliance Nurse with Delaware Health and Social Services. Ms. Jester conducts investigations to determine whether hospitals are in compliance with healthcare regulations. Ms. Jester states in her October 8, 2003 report as follows:**

> Based on closed clinical record review, staff interview and document review it was determined that the registered nurse (RN) failed to supervise and evaluate the nursing care provided to one patient in the sample in accordance with acceptable standards of practice.
>
> \* \* \* \*
>
> The hospital failed to meet the emergency needs of Patient #1, who had complaints of unrelieved chest pain, in accordance with acceptable standards of nursing practice. This was demonstrated by failure of staff: 1) to evaluate Patient #1 when the central cardiac monitor alarm at the ED nurse's station indicated a change in cardiac rhythm, b) to assess the effectiveness of medications administered for Patient #1's complaints of chest pain, c) to monitor Patient #1's decreasing blood pressure and d) to develop policies regarding the management of chest pain in the ED setting.

**IX.    STATEMENT OF WHAT DEFENDANTS INTENDS TO PROVIDE IN SUPPORT OF DEFENSE**

Ross E. Megargel, D.O., a board certified emergency medicine specialist, will testify that Ronald Lebman, M.D. did not violate the standard of care in connection with his evaluation and treatment of Ms. Bailey at Kent General Hospital on January 19, 2003. He will testify that the patient was seen and evaluated in a timely manner, that the standard of care did not require that oxygen be administered to the patient in view of her adequate oxygenation as demonstrated by the pulse oximetry reading, that the EKG performed on Ms. Bailey was not suggestive of cardiac ischemia, that the appropriate laboratory studies were ordered, as was the administration of nitroglycerin. When the patient's complaints were not relieved by nitroglycerin, it was appropriate to consider an etiology other than cardiac for her chest pain and to order a GI cocktail and Ativan.

Dr. Megargel will also testify that it cannot be stated within terms of reasonable medical probability that the patient would have survived had the leads-off alarm not been silenced. Dr. Megargel will also testify that the circumstances of this presentation, despite the outcome, do not represent a violation of EMTALA. Dr. Megargel will offer his opinions within terms of reasonable medical probability.

### X.  COUNTERCLAIMS

Not applicable.

### XI.  AMENDMENT OF PLEADINGS

Not applicable.

### XII.  CERTIFICATION OF TWO WAY COMMUNICATION TO EXPLORE SETTLEMENT

There has been communication concerning settlement, but the parties have been unable to resolve the matter.

## XIII. CONCLUSION

This Order shall control the subsequent course of the action unless modified by the Court to prevent manifest injustice.

                                        Respectfully Submitted,

| | |
|---|---|
| **POTTER, CARMINE &** **AARONSON, P.A.** | **KLINE & SPECTER** **A Professional Corporation** |
| BY: S/ STEPHEN POTTER, ESQUIRE<br>STEPHEN POTTER, ESQUIRE<br>840 North Union Street<br>Post Office Box 514<br>Wilmington, Delaware 19899<br>(302) 658-8940<br>Attorney for Plaintiffs | By: S/JOSHUA VAN NAARDEN, ESQUIRE<br>THOMAS R. KLINE, ESQUIRE<br>LEON AUSSPRUNG, ESQUIRE<br>JOSHUA VAN NAARDEN, ESQUIRE<br>1525 Locust Street - 19th Floor<br>Philadelphia, PA 19102<br>(215) 772-1000<br>Attorney for Plaintiffs |

**PRICKETT, JONES & ELLIOTT, P.A.**

BY: S/MASON TURNER, ESQUIRE
MASON TURNER, ESQUIRE
Attorney for Defendants
1310 King Street
Wilmington, Delaware 19899
302-888-6508