<u>**EXHIBIT H**</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| GLADYS BAILEY, as the Administratrix of the Estate of DEBBIE BAILEY, deceased, et al | : : : : | C.A. No. 04-1540-GMS |
| v | : : | JURY TRIAL |
| RONALD I. LEBMAN, M.D., et al | : | |

<u>**PLAINTIFFS' TRIAL BRIEF**</u>

 

**POTTER, CARMINE & AARONSON, P.A.**
BY: <u>S/ STEPHEN POTTER, ESQUIRE</u>
STEPHEN POTTER, ESQUIRE
840 North Union Street
Post Office Box 514
Wilmington, Delaware 19899
(302) 658-8940
Attorney for Plaintiffs

**KLINE & SPECTER
A Professional Corporation**
By: <u>S/JOSHUA VAN NAARDEN, ESQUIRE</u>
THOMAS R. KLINE, ESQUIRE
LEON AUSSPRUNG, ESQUIRE
JOSHUA VAN NAARDEN, ESQUIRE
1525 Locust Street - 19th Floor
Philadelphia, PA 19102
(215) 772-1000
Attorney for Plaintiffs

DATED:   May 30, 2006.

## TABLE OF AUTHORITIES

Cases:                                                                                                        Page:

Correa v. Hospital San Francisco, 69 F.3d 1184, 1192 (1st Cir. 1995)          12

Barber v. Hospital Corp. of America, 977 F.2d 872, 879 (4th Cir. 1992)        12

Repp v. Anadarko Municipal Hospital, 43 F.2d 519, 522 (10th Cir. 1994)        12

Gatewood v. Washington Healthcare Corp., 933 F.2d 1037, 1041 (D.C. Cir. 1991) 12

Summers v. Baptist Med. Center Arkadelphia, 91 F.3d 1132, 1140 (8th Cir. 1996) 12


Authorities:

42 U,S,C,A. § 1395dd                                                          3, 6, 8

10 De. C. § 3701                                                              11

10 Del. C. § 3724                                                             11

A.  **NATURE OF THE CASE**

This is a medical negligence and EMTALA case in which plaintiff seeks compensatory and punitive damages for injuries to, and death of, Debbie Bailey, which was caused by defendants, Ronald Lebman, MD ("Lebman") and Kent General/Bayhealth ("Bayhealth"). On January 19, 2003, decedent Debbie Bailey ("Mrs. Bailey") came to the Emergency Department at Defendant Kent General/Bayhealth ("Bayhealth") seeking emergency medical treatment for an emergency medical condition manifested by complaints of chest pain and shortness of breath, as well as nausea. In addition to the reporting of the acute onset of severe chest pain, Mrs. Bailey rated her chest pain as an 8 out of 10. Mrs. Bailey's chest pain was unchanged after the administration of nitroglycerine. Defendants recklessly intentionally turned off decedent's cardiac monitor and she was left in an examination room without observation until she was "found unresponsive" 35 minutes after last being seen.

Plaintiff alleges that the defendants were reckless and negligent in their care and treatment of the plaintiff, by failing to properly and adequately treat the plaintiff for the condition from which she was suffering on January 19, 2003. The Defendants also recklessly employed inadequate and/or inappropriate methods, techniques, and procedures in the care and treatment of the plaintiff and failed to take proper measures to determine whether she was suffering from a myocardial infarction ("MI"). In direct violation of 42 U.S.C.A. §1395dd the defendants recklessly and intentionally failed to appropriately screen and administer care to Debbie Bailey and treated her differently then similarly situated patients who present with complaints of chest pain. Most notably, the cardiac monitor, that was supposed to be monitoring Debbie Bailey's cardiac rhythm, was intentionally silenced and shut off such that appropriate monitoring could not be achieved.

The Defendants were jointly and severally negligent and careless in failing to timely and

3

properly evaluate, monitor and treat Plaintiff's medical condition and also failing to perform an appropriate screening examination and /or stabilize decedent's emergency medical condition in violation of the EMTALA statutes, all of which ultimately caused Plaintiff to suffer severe injuries and die.

**B.    CONTESTED FACTS PLAINTIFFS EXPECTS THE EVIDENCE WILL ESTABLISH**

1. On January 19, 2003, at approximately 9:00 p.m. Debbie Baily's EKG revealed findings consistent with the early electro cardiographic changes seen in an acute myocardial infarction.

2. On January 19, 2003, at approximately 10:20 p.m., Mrs. Bailey is "found unresponsive" and was not being properly monitored or being attended to by any hospital personnel.

3. Debbie Bailey was not placed on oxygen at any time prior to the administration of cardiopulmonary resuscitation.

4. Cardiac monitoring and oxygen are integral parts of a proper EMTALA medical screening examination and are also required by the standard of care.

5. Debbie Bailey's injuries and death would have been prevented if the defendants had properly and appropriately monitored and treated her condition upon presentation to Bayhealth.

6. Defendants' violated § 1395dd(a) of EMTALA by failing to afford Mrs. Bailey an appropriate medical screening examination on January 19, 2003, in order to determine whether an emergency medical condition existed

7. Defendants failed to conduct a full and complete medical screening examination on Debbie Bailey.

8. Defendants performed an inadequate triage examination without an appropriate complete medical screening examination.

9. Debbie Bailey was treated disparately from other similarly situated patients.

10. Defendants departed from their standard medical screening examination of patients with complaints and symptoms similar to those of Mrs. Bailey.

4

11. Defendants failed to timely determine whether or not an emergency medical condition existed.

12. Defendants failed to adhere to their own standard policies, procedures and/or protocols for patients entering the Emergency Department in similar medical circumstances.

13. Defendants failed to perform a medical screening examination within the capabilities of the defendant hospitals' Emergency Department and ancillary services.

14. Defendants' conduct exhibited a willful, reckless and/or conscious disregard of, or reckless and/or conscious indifference to, the rights, safety and health of Mrs. Bailey under circumstances where the probability of harming Mrs. Bailey by engaging in such conduct was known, or should have been known, by the defendants.

15. Defendants' conduct fell below the standard of care and/or was intentional and/or reckless.

16. All of the above caused decedent's injuries and death.

C. **PLAINTIFFS' THEORY OF LIABILITY**

Plaintiffs have served reports from five (5) experts setting forth the bases of liability and causation. Relevant portions of these reports are identified below:

1. **Albert C. Weihl, M.D.**

**Dr. Weihl is board certified in Emergency Medicine, Internal Medicine with a subspecialty in Endocrinology and Metabolism. Dr. Weihl is presently an Assistant Clinical Professor of Emergency Medicine for the Department of Surgery and Internal Medicine at Yale University School of Medicine. Dr. Weihl states in his September 29, 2005 report as follows:**

The following deviations from the standard of care are evidence in the care rendered to Ms Debbie Bailey:

1. Failure by the nurses to triage the patient to an emergency treatment area immediately upon her presentation, within 5 minutes of her arrival with complaints of chest pain and shortness of breath that MUST be assumed to be of cardiac origin in this patient.
2. Failure by the nurses and Dr. Lebman to place the patient on oxygen therapy.
3. Failure by the nurses and Dr. Lebman to maintain the patient on a cardiac monitor with alarms enabled.
4. Failure by the nurses to have the patient assessed by a physician immediately upon her placement in a treatment area within the Emergency Department.
5. Failure by Dr. Lebman to perform a repeat EKG in view of the technical

5

        limitations of the first EKG, and abnormalities seen of the first EKG.

6. Failure by Dr. Lebman to act appropriately in view of the abnormalities seen in the first technically limited EKG that strongly suggested cardiac ischemia in this patient at risk for same.

7. Improper administration of Ativan, a non-analgesic sedative, to this patient for treatment of her chest pain by Dr. Lebman, when administration of an analgesic such as morphine sulfate with sedative properties was required in light of the patient's lack of pain relief after administration of nitroglycerine.

8. Failure by the nurses and Dr. Lebman to observe and monitor this patient for her response to treatment for the 30 minutes between 9:50 PM and 10:20 PM at which time she was found without vital signs.

Deviations numbers 1-4 also are violations of the EMTALA statute applying to patient with an Emergency Medical Condition, which Ms. Bailey clearly presented with complaints of chest pain and shortness of breath.

* * * *

Had Ms. Bailey been diagnosed and treated in conformance with the standard of care, she would have survived her hospitalization in January 2003, and would have looked forward to a life expectancy of approximately 25 - 30 years.

**2.  Charles Pozner, M.D.**

**Dr. Pozner is board certified in Emergency Medicine and Internal Medicine. Dr. Pozner is presently an Assistant Professor of Medicine at Harvard Medical School. Dr. Pozner states in his September 30, 2005 report as follows:**

1. **Deviation of Standard of Care for patients presenting with chest pain and shortness of breath.**

    Chest pain and shortness of breath can be the presenting complaint of a wide spectrum of diagnoses, from the life threatening to the benign. In emergency medicine, the first priority of the treating clinician is to treat and/or rule out life-threatening causes, leaving other more benign causes to be sorted out over time. Given the potential life threatening nature of Ms. Bailey's chief complaint, especially in light of her underlying diagnosis of diabetes mellitus, triaging her to the waiting room, employing a classification system that could have led to a four hour wait, was inappropriate. Standard of care would have been to have Ms. Bailey urgently brought back to the ED, where she should have been placed on a cardiac monitor, started on oxygen therapy (which was never done while in the ED until she was being resuscitated), had a diagnostic EKG performed and red by an appropriate physician.

    Once in the ED treatment area, the treating physician, Dr. Lebman, should

6

have promptly evaluated Ms. Bailey in order to further assess the etiology of her chief complaint and begin treatment to avert potential worsening of any life threatening diagnosis. Having interpreted her EKG as possibly representing coronary ischemia, Dr. Lebman was clearly concerned that Ms. Bailey was suffering from an acute coronary syndrome (ACS). Despite this, ti took 29 minutes for the patient to receive treatment with nitroglycerin and aspirin. Standard of care would have included prompt administration of oxygen, nitroglycerin, aspirin, and beta blockers. There was no evidence in the medical record that oxygen was administered in contradiction to stated hospital policy, as per testimony in deposition. A repeat EKG should have been obtained within a short period fo time in order to reevaluate for changes indicative of myocardial ischemia; which might have been missed on the initial EKG due to the dynamic electrocardiographic changes that may occur in the setting of an ACS. Continued chest pain in the setting of presumed ACS should have resulted in the consideration of the initiation of heparin, glycoprotein 2B/3A inhibitors, intravenous heparin, further diagnostic studies including bedside echocardiogram, and/or emergent cardiac catheterization. A cardiology consult should also have ben considered. Morphine sulfate should have been considered as an alternative had nitrates not relieved her pain. Ms. Bailey, whose odd behavior was thought by the clinicians caring for her to be related to a possible drug ingestion (which was not found to be the case on post-mortem), was most likely related to her underlying sense that she had a premorbid condition. Pain control with morphine would have been a humane addition to Ms. Bailey's care to treat her conscious pain and suffering. All of these failures by Dr. Lebman and the staff caring for Ms. Bailey constituted deviations in the standard of care for patients presenting with chest pain and shortness of breath thought to be due to myocardial ischemia.

Although there was no evidence of mural rupture or infarction on the gross and microscopic specimens on autopsy, the findings of interstitial fibrous connective tissue, particularly surrounding the blood vessels, as well as severe concentric stenosis in the distal left anterior descending artery, are consistent with a milieu of microvascular ischemia leading to arrhythmia in a diabetic patient.

2. **The intentional and reckless discontinuation of central monitoring in a patient at risk for cardiac arrhythmia or other decrement in condition.**

One of the major responsibilities of an emergency department is to monitor for changes in the condition of patients under their care. This may include, among other interventions, repeating vital signs, obtaining a repeat EKG, or placing a person on a centrally alarmed monitor. In a patient with ACS, one of the leading causes of early death is the development of a life-threatening arrhythmia. This is the reason patients with possible ACS are placed on a monitor that will alarm if an arrhythmia develops. Ms. Bailey ultimately

> developed ventricular fibrillation. Due to an ED staff member's intentional and wanton disregard for the safety of Ms. Bailey, this eminently treatable arrhythmia went unnoticed until she had a refractory dysrhythmia. In addition, had central monitoring been continued, earlier and less detrimental arrhythmias could have ben discovered, leading to interventions that may have avoided the development of ventricular fibrillation. Data exist that support that the longer one is in ventricular fibrillation without defibrillation; there is an absolute decrease in the chance for successful defibrillation. In fact, it is commonly stated that, "for every minute of VF, one loses approximately 10% chance of return of spontaneous circulation. Had Ms. Bailey been kept on the monitor, and the alarms been responded to, she would almost certainly been found earlier in her course of VF, leading to a significantly increased chance of survival.

Had the proper standard of care been met, as described in #'s 1 and 2, any myocardial injury that may have resulted would have been detected in a timely manner, and proper intervention taken place. The failures to detect, treat, and intervene in a timely manner of this potentially fatal presentation, to a reasonable degree of medical probability, were a cause of her death.

### 3. Mark Hastings, R.N.

**Mark Hastings, R.N. is a staff Registered Nurse in the Emergency Department of Southern New Hampshire Medical Center and Regional Trauma Center in Nashua, NH. Mr. Hastings is also a Clinical Preceptor in emergency department health care, teaching paramedic interns and nursing students. Mr. Hastings states in his November 14, 2005 report as follows:**

> The ED nurses and Dr. Lebman deviated from the standard of care, violated the EMTALA statute and acted in a reckless, careless manner as follows:
>
> 1. Failing to properly administer Oxygen to Ms. Bailey as required by hospital policy;
> 2. Intentionally and purposefully silencing Ms. Bailey's cardiac monitor contrary to hospital policy;
> 3. Failing to appropriately screen Ms. Bailey for a medical condition upon request within the capability of the ED;
> 4. Failure to appropriately identify the emergent medical needs of Ms. Bailey within the capability of the ED;
> 5. Failing to appropriately utilize all available ancillary services and equipment;
> 6. Failing to appropriately stabilize the emergent medical condition of Ms. Bailey within the capability of the ED;
> 7. Treating Ms. Bailey different from other similarly situated patients.
>
> It is my opinion, within a reasonable degree of clinical and nursing probability that the Bayhealth Medical Center and its emergency department, deviated from the

accepted standards of care for the patient with chest pain. These deviations were direct causes in bringing about the conscious pain, suffering and death of Ms. Bailey.

4.  **Kathleen Hirsch, RN, MSN, MBA, CEN**

**Kathleen Hirsch, R.N. is a certified Emergency Nurse. Ms. Hirsch is presently an Assistant Chief Nursing Officer at Memorial Hospital of Salem County, Salem, NJ. Ms. Hirsch states in her September 27, 2005 report as follows:**

The statement alone of chest pain and shortness of breath combined with the risk factor of diabetes mellitus should have triggered a high index of suspicion that her presentation indicated a cardiac emergency. In the context of her emergent presentation this marks a deviation from the standard of care. Even after it was noted at 8:35pm that Ms. Bailey was hollering and spitting in the lobby, which may have been a manifestation of acute pulmonary edema, it appears that she was left in the lobby and interviewed by a registrar at 8:46pm. This caused a delay in Ms. Bailey getting definitive emergency care.

* * * *

There is no documentation of how the patient appeared such as skin, breathing pattern and effort or of a chest auscultation to assess lung sounds.

* * * *

Throughout the progression of Ms. Bailey's care, which included encounters with five registered nurses, there is no adequate documentation of how the patient appeared and assessment of any body systems, which is below the standard of care. Oxygen, which is a primary treatment in chest pain, was never administered in any form until the resuscitation period, despite being required by the standard of care and hospital policy.

* * * *

Between 9:50 pm and 10:20 when Ms. Bailey was found in cardiopulmonary arrest she was not reevaluated for her response to pain medication a review of her cardiac rhythm or any other systems assessment all, which is required by the standard of care. Ms. Bailey was obviously being worked-up as if a cardiac emergency was suspected however, the assessments provided to her were not in accordance with the standard of care that is customarily applied for the frequency and comprehensiveness of reassessment and stabilization.

A gross deviation from the standard of care and hospital policy was further demonstrated in failure to provide continuous cardiac monitoring. First, in the obvious failure to have a person continuously visualizing the monitor and second that the alarm on the monitor had been shut off at the nurses' main monitor at the nurses'

9

station. The mechanism required to silence the monitor took intentional directed actions that are specific to only one monitor. Disabling the monitor was an act of willful indifference to the safety and welfare of Ms. Bailey and directly causing her injuries and death.

Bayhealth Medical Center failed to assure the provision of an appropriate medical screening exam to Ms. Bailey. The comprehensive medical screening exam sufficient to identify an emergency medical condition was not provided to Ms. Bailey as per the standard of care and hospital policy. Miss Bailey was treated different than other similarly situated chest pain patients. Further, the willful act of disabling the alarm on the monitor that was in place to announce changes in Ms. Bailey's cardiac rate or rhythm was a provision of disparate care due to that fact that only the one alarm had been intentionally singled out and silenced.

All the above-discussed failures are deviations from the standard of care regarding the medical care of Debbie Bailey by the nursing staff of Bayhealth Medical Center as well as Bayhealth Medical Center itself, were direct causes of Ms. Bailey's injuries. I hold all the above opinions to a reasonable degree of medical probability/certainty.

5.     **Cindy L. Jester, MSN, RN**

**Cindy Jester, MSN, RN is a Compliance Nurse with Delaware Health and Social Services. Ms. Jester conducts investigations to determine whether hospitals are in compliance with healthcare regulations. Ms. Jester states in her October 8, 2003 report as follows:**

Based on closed clinical record review, staff interview and document review it was determined that the registered nurse (RN) failed to supervise and evaluate the nursing care provided to one patient in the sample in accordance with acceptable standards of practice.

* * * *

The hospital failed to meet the emergency needs of Patient #1, who had complaints of unrelieved chest pain, in accordance with acceptable standards of nursing practice. This was demonstrated by failure of staff: 1) to evaluate Patient #1 when the central cardiac monitor alarm at the ED nurse's station indicated a change in cardiac rhythm, b) to assess the effectiveness of medications administered for Patient #1's complaints of chest pain, c) to monitor Patient #1's decreasing blood pressure and d) to develop policies regarding the management of chest pain in the ED setting.

D.    **PLAINTIFFS' THEORY OF DAMAGES**

Plaintiffs seek recovery pursuant to the Delaware Wrongful Death and Survival Acts, 10 Del. C. §3724 and 10 Del. C. §3704.

1.    **ECONOMIC DAMAGES**

**Plaintiffs' expert, David L. Hopkins, ASA, is an economist and is certified in actuarial science. Mr. Hopkins states in his September 30, 2005 report as follows:**

> The Summary figures presented below include the respective amounts of Past Lost Net Income, Future Lost Net Income, Past Lost Household Services, and Future Lost Household Services.

**Net Lost Income**

|  | $3,000/yr | $6,000/yr | $9,000/yr |
|---|---|---|---|
| Work through age 55 | $167,914 | $203,673 | $239,432 |
| Work through age 60 | $179,445 | $226,736 | $274,026 |
| Work through age 65 | $189,889 | $247,624 | $305,359 |
| Work through age 70 | $199,349 | $266,544 | $333,738 |

The above economic damages includes $94,232 for lost household services, plus an additional $2,000 for funeral expenses.

2.    **NON-ECONOMIC DAMAGES**

Debbie Bailey experienced conscious pain and suffering as a result of the negligent and/or reckless actions and omissions of the Defendants. Debbie Bailey is survived by Gladys Bailey, Dominick Bailey, Demetria Bailey, Tia Bailey and Amber Baily, who each have a clam for mental anguish associated with the death of their loved one and all other damages available under the Wrongful Death and Survival Acts.

3.    **PUNITIVE DAMAGES**

Plaintiffs have a claim for punitive damages based upon the intentional and/or reckless acts and omissions of the Defendants. However, Defendants have refused to disclose the Hospital's net worth.

E.   **PLAINTIFFS' THEORY FOR DIRECTED VERDICT**

      Plaintiffs incorporate by reference their Brief in support of their Motion for Partial Summary Judgment as to EMTALA violations as if full stated herein. Citations in support of Plaintiffs Motion for Partial Summary Judgment are listed in the Table of Authorities.

Respectfully Submitted,

| **POTTER, CARMINE &** | **KLINE & SPECTER** |
| **AARONSON, P.A.** | **A Professional Corporation** |

BY: S/ STEPHEN POTTER, ESQUIRE  
    STEPHEN POTTER, ESQUIRE  
    840 North Union Street  
    Post Office Box 514  
    Wilmington, Delaware 19899  
    (302) 658-8940  
    Attorney for Plaintiffs

By: S/JOSHUA VAN NAARDEN, ESQUIRE  
    THOMAS R. KLINE, ESQUIRE  
    LEON AUSSPRUNG, ESQUIRE  
    JOSHUA VAN NAARDEN, ESQUIRE  
    1525 Locust Street - 19th Floor  
    Philadelphia, PA 19102  
    (215) 772-1000  
    Attorney for Plaintiffs