**EXHIBIT H**

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| GLADYS BAILEY, as the Administratrix of the Estate of DEBBIE BAILEY, deceased, and DOMINICK BAILEY, DEMETRIA BAILEY, Individually and as Guardian for AMBER BAILEY, a minor, and TIA BAILEY, | C.A. No. 04-1540 GMS. |
| | JURY TRIAL. |
| Plaintiffs, | |
| v. | |
| RONALD I. LEBMAN, M.D., DELMARVA EMERGENCY PHYSICIANS, LLP and BAYHEALTH MEDICAL CENTER, INC., d/b/a KENT GENERAL HOSPITAL, | |
| Defendants. | |

**DEFENDANTS' TRIAL BRIEF**

PRICKETT, JONES & ELLIOTT, P.A.
BY: MASON E. TURNER, JR., NO. 661
1310 KING STREET
P.O. BOX 1328
WILMINGTON, DE 19899-1328
(302) 888-6508
ATTORNEY FOR DEFENDANT
BAYHEALTH MEDICAL CENTER, INC.
DELMARVA EMERGENCY PHYSICIANS, LLP
AND RONALD I. LEBMAN, M.D.
E-MAIL: METURNER@PRICKETT.COM

DATED:      May 30, 2006.

## **Table of Contents**

|                                                        | Page |
| ------------------------------------------------------ | ---- |
| Table of Contents:                                     | i    |
| Table of Authorities:                                  | ii   |
| Nature of the Case:                                    | 1    |
| Contested Facts That The Evidence Will Establish::     | 2    |
| Theory of Defense:                                     | 4    |
| Theory of Damages:                                     | 5    |
| Theory of Anticipated Motion for Directed Verdict:     | 7    |

**Table of Authorities**

Cases:                                                                    Page:

Benson v. Lynch, 404 F.Supp. 8 (D.Del. 1975):                            5

Bradley v. Dionisi, 1988 Westlaw 130411 (Del. Super. 1988):             6

Cann v. Mann Construction Co., Del. Super., 93 A.2d 741, 743 (1952):    6

Johnson v. Physicians Anesthesia Services, Inc., P.A.,
 621 F. Supp. 908, 912-13 (D.Del. 1985):                                5

Magee v. Rose, Del. Super., 405 A.2d 143, 146 (1979):                   6

Sterner v. Wesley College, Inc., 747 F. Supp. 263, 268 (D. Del. 1990): 5


Authorities:

10 Del..C. §3701:                                                       5

10 Del.C. §3724:                                                        5, 6, 7

42 U.S.C. §1395cc:                                                      1

## NATURE OF THE CASE

This is a wrongful death action predicated upon claimed medical negligence in connection with an Emergency Department presentation of the decedent, Debbie Bailey, to Kent General Hospital in Dover, Delaware, on January 19, 2003.

The parties are the decedent's mother in her capacity as administratrix of the decedent's estate and the decedent's four children, one of whom is a minor. The defendants are Ronald Lebman, M.D., an emergency physician, DelMarVa Emergency Physicians, LLP, which plaintiffs claim employed Lebman, and Bayhealth Medical Center, Inc., which provided the facilities and staff at the time of the decedent's treatment on January 19, 2003.

Plaintiffs claim that medical negligence on the part of defendants caused the decedent's death. Moreover, plaintiffs claim that defendant violated the federal anti-dumping statute, EMTALA, 42 U.S.C. §1395cc.

1

## CONTESTED FACTS THAT THE EVIDENCE WILL ESTABLISH

Defendants refer to and incorporate by reference the Statement of Facts found at pages 2-3 of their brief, dated May 25, 2006, in Opposition to Plaintiffs' Motion for Partial Summary Judgment.

In addition, defendants expect the evidence to establish that the diagnostic process which was implemented in connection with decedent's presentation to the Kent General Hospital Emergency Department was proper and within the standard of care and that an appropriate medical screening examination as required by EMTALA was in the process of being completed when interrupted by the patient's arrest. Specifically, the testimony will establish that it was appropriate to perform an electrocardiogram, that the electrocardiogram was not diagnostic of any acute cardiac event, that there was no medical basis for immediately repeating the EKG, that an IV line was appropriately established, that an appropriate initial history and physical examination were performed by Dr. Lebman and that it was appropriate to order sublingual nitroglycerin in an attempt to relieve the patient's pain complaints. When two doses of the medication did not relieve those complaints and when the patient's blood pressure dropped (which is a known side effect of nitroglycerin) it was appropriate for Dr. Lebman to order that further nitroglycerin not be administered and that a GI cocktail and Ativan be administered in order to address plaintiff's pain. Pain of a cardiac origin is often ameliorated by nitroglycerin; chest pain can also be caused by abnormalities of the gastrointestinal tract and the GI cocktail was directed to that possibility. A patient administered a GI cocktail will normally be observed for 30 to 45 minutes to see if relief is forthcoming before considering alternative interventions. Defendants acknowledge that the silencing of the cardiac monitor alarm at the central nursing station was not appropriate although apparently done in reaction to the patient continually

removing the cardiac monitor leads, which caused the leads-off alarm to repeatedly sound. Finally, defendants expect the evidence to establish that it cannot be said in terms of medical probability that treatment different than that provided by the defendants would have ensured the patient's survival.

## THEORY OF DEFENSE

Defendants will contend at trial, while acknowledging that the silencing of the alarms was inappropriate, that it cannot be established within terms of medical probability that that error or any of the other alleged acts of negligence attributed to defendants by plaintiffs caused the patient's death since the autopsy established that the decedent's left coronary artery was narrowed to pinpoint size, a condition colloquially known as a "widow maker".

Dr. Lebman's evidence will establish that he took the appropriate steps in a timely and proper fashion in the course of providing a medical screening examination to the patient, which was still in progress at the time of her death and that the EKG performed on the patient was not suggestive of cardiac ischemia, that the appropriate laboratory studies were ordered and performed and that it was appropriate to initiate treatment with nitroglycerin and to terminate that treatment when it did not relieve the plaintiff's complaints and produced the known side effect of hypotension leading Dr. Lebman to appropriately consider an etiology other than cardiac for the patient's chest pain and to order a GI cocktail and Ativan.

For the reasons discussed in Defendant's Brief, dated May 25, 2006, in Opposition to Plaintiffs' Motion for Partial Summary Judgment, the circumstances of this case do not implicate a violation of EMTALA and Dr. Megargel, the defense expert, will so testify. Moreover, as discussed in that brief, EMTALA does not permit a private civil cause of action against a physician such as Dr. Lebman.

4

## THEORY OF DAMAGES

(A)    There is no evidence upon which to predicate a survival claim under 10 Del..C. §3701.

Under Delaware Law, a survival claim can be presented for the conscious pain and suffering experienced by the decedent between the time of negligence and the time of death. However, to sustain such a claim, plaintiff must produce evidence establishing the period of time after the alleged negligence when the decedent experienced conscious pain and suffering and the nature and extent of any such suffering. Benson v. Lynch, 404 F.Supp. 8 (D.Del. 1975); Magee v. Rose, Del Super., 405 A.2d 143 (1979). In this case, any such testimony would necessarily have to be of an expert nature and plaintiffs have simply failed to identify any such evidence in their expert disclosures.

(B)    Punitive damages are not recoverable in a wrongful death action.

The Delaware Wrongful Death Statute, 10 Del.C. §3724, is in derogation of the common law and must be construed strictly and recovery limited to the plain language of the statute. Magee v. Rose, Del. Super., 405 A.2d 143, 147 (1979); Johnson v. Physicians Anesthesia Services, Inc., P.A., 621 F. Supp. 908, 912-13 (D.Del. 1985). That statute does not provide for recovery of punitive damages and such damages are, therefore, not available under the wrongful death statute. Sterner v. Wesley College, Inc., 747 F. Supp. 263, 268 (D. Del. 1990).

(C)    Permissible economic recovery in wrongful death action.

In Exhibit G to the Pretrial Order, plaintiffs assert that they are seeking to recover special damage in amounts ranging from $167,914.00 to $333,738.00 based on lost net income of the decedent and lost household services. These calculations in turn are derived from a report prepared by David L. Hopkins, an actuary, which is attached as Exhibit A. To the extent this

report assumes that lost earnings are a proper element of damages in a wrongful death action, it

is not in accord with 10 Del.C. §3724 which is very specific in terms of the allowable economic

damages in the context of a wrongful death action, as follows:

> "(1)    Deprivation of the expectation of pecuniary benefits to the beneficiary or beneficiaries that would have resulted from the continued life of the deceased;
>
> (2)    Loss of contributions for support;
>
> (3)    Loss of parental, marital and household services, including the reasonable cost of providing for the care of minor children."

The Hopkins' calculation to the extent it concerns household services, fits within the

rubric of 10 Del.C. §3724.  Loss of life time earnings as calculated by Hopkins is simply not an

element of damages permitted by 10 Del.C. §3724.  The proper measure of damages for a

decedent's earnings is the actual pecuniary loss occasioned by death, this amount being the

amount that the decedent probably would have earned, saved and left to his next of kin at the end

of his or her life expectancy.  Cann v. Mann Construction Co., Del. Super., 93 A.2d 741, 743

(1952); Bradley v. Dionisi, 1988 Westlaw 130411 (Del. Super. 1988) (Attached as Exhibit B).

## THEORY OF ANTICIPATED MOTION FOR DIRECTED VERDICT

As articulated in the preceding section of the Pretrial Brief, it is anticipated that defendant will move for a directed verdict in connection with the survival claim because of the absence of evidence establishing the conscious pain and suffering between time of negligence and time of death which is the predicate for such a claim and as to so much of plaintiffs' claim for special damages as goes beyond the calculated of household services permitted by 10 Del.C. §3724.

Respectfully submitted,

PRICKETT, JONES & ELLIOTT, P.A.

BY:  MASON E. TURNER, JR., NO. 661
1310 KING STREET
P.O. BOX 1328
WILMINGTON, DE  19899-1328
(302) 888-6508
ATTORNEY FOR DEFENDANT
BAYHEALTH MEDICAL CENTER, INC.
DELMARVA EMERGENCY PHYSICIANS, LLP
AND RONALD I. LEBMAN, M.D.
E-MAIL:  METURNER@PRICKETT.COM

DATED:        May 30, 2006.

7

## **Compendium of Exhibits**

Exhibit A:    Report prepared by David L. Hopkins.

Exhibit B:    <u>Bradley v. Dionisi</u>, 1988 Westlaw 130411 (Del. Super. 1988).

# EXHIBIT "A"

**DAVID L. HOPKINS, ASA, MAAA**
ACTUARIAL - ECONOMIC CONSULTING
182 EAST DEKALB PIKE
KING OF PRUSSIA, PA 19406
PHONE (610) 768-7180 • FAX (610) 768-7184

## DEBBIE BAILEY

Loss of Net Income &
Household Services

Prepared for:

Joshua VanNaarden, Esq.
**KLINE & SPECTER**
1525 Locust Street, 19th Floor
Philadelphia, PA 19102

Prepared by:

David L. Hopkins, ASA, MAAA
September 30, 2005

Debbie Bailey

## BACKGROUND

Debbie Bailey was born on January 27, 1961. Therefore, she was 41.9 years of age at the time of her death on January 19, 2003. Mrs. Bailey had gone to the hospital with shortness of breath and chest pain; she was found unresponsive in bed shortly thereafter. The autopsy indicates that the cause of death was cardiac dysrhythmia due to arteriosclerotic coronary artery disease.

According to Social Security records, Ms. Bailey had worked sporadically from 1975 (age 14) to 1989. She did not have any reported earnings in the years 1990-1996. However, she had reported earnings in each year from 1997 to 2002:

| Year | Earnings |
|------|----------|
| 1997 | $1,265 |
| 1998 | $3,341 |
| 1999 | $6,856 |
| 2000 | $12,452 |
| 2001 | $3,195 |
| 2002 | $1,976 |

Ms. Bailey's mother and her daughters have indicated in their deposition that Ms. Bailey "worked off and on" including work with Procter & Gamble, Scott Paper Company, and work as a mail room clerk for Client Logic. It has also been indicated that Ms. Bailey was receiving Supplemental Security Income (SSI) of $400 or more per month. Ms. Bailey is survived by her four children: Demetria (age 24), Dominick (age 20), Tia (age 19) and Amber (age 14). Ms. Bailey lived at home with her three younger children at the time of her death. Her mother, Gladys Bailey, has indicated in her deposition that "Debbie did everything" for her household and her children. The lost household services would include cooking, cleaning, childcare, grocery shopping, errands, and handling the family finances. Ms. Bailey also provided for the expenses of the household, although the family received public benefits for a portion of these expenses.

Debbie Bailey

## LIFE EXPECTANCY

As indicated previously, Ms. Bailey was 41.9 years of age at the time of her death on January 19, 2003. The normal life expectancy for a female of this age would be 37.2 additional years, based upon the 2002 U. S. Life Tables, as published by the U. S. Department of Health and Human Services.

Adding the life expectancy of 37.2 years to the age at death of 41.9 years would indicate an expected life span for Ms. Bailey of 79.1 years.

Had she not died, Ms. Bailey would have currently been 44.7 years of age. Therefore, 34.4 years would have remained in the normal life expectancy for Ms. Bailey, had she not died.

## WORKLIFE EXPECTANCY

Based upon information and statistics published by the U. S. Department of Labor and Vocational Econometrics, consideration is made in this report for a normal worklife period for Ms. Bailey that would be approximately equivalent to work through retirement at age 55, age 60, age 65, or age 70. It should be noted that Ms. Bailey's normal retirement age under the Social Security System would have been age 67.

Based upon work through retirement at age 55, the future worklife expectancy period as of the current date would be 10.3 years. Based upon work through retirement at age 60, the future worklife expectancy period as of the current date would be 15.3 years. Based upon work through retirement at age 65, the future worklife expectancy period as of the current date would be 20.3 years. The future worklife expectancy period would be 25.3 years, based upon work through retirement at age 70.

Debbie Bailey

## PAST LOST NET INCOME

It is appropriate to a make a calculation for the amount of the net lost income of Ms. Bailey that would have been available for the support of her survivors, had she not died. As indicated previously, Ms. Bailey was receiving Supplemental Security Income of $400 (or more) per month, or $4,800 per year. Her mother and her daughters indicate that she "worked off and on" and she reported earnings in each year from 1997 to 2002. However, most of the earnings in those years were at the level of $3,500 or less; the earnings in 1999 were $6,856 and the earnings in 2000 were $12,425. The amount of the net lost income that would be available to the family members would be the total amount of the Ms. Bailey's income, less the amount of the lost income that she would have used for her own expenses. For purposes of this report, consideration is made for a net loss of income of $3,000 per year; $6,000 per year; or $9,000 per year. On this basis, the total amount of the past lost net income through the current date would be as follows:

Net lost income of $3,000 per year..............    $8,082
Net lost income of $6,000 per year..............    $16,165
Net lost income of $9,000 per year..............    $24,247

Debbie Bailey

## FUTURE LOST NET INCOME

The future amount of net lost income is measured for an appropriate period of loss in the future. It is anticipated that it would be necessary for Ms. Bailey to have earnings in addition to her public benefits in order to achieve a level of net loss income that would be available for the support of her survivors, had she not died. Therefore, the net future loss of income is measured for an appropriate working period in the future, as described in the worklife expectancy section of this report. The future amount of net lost income is measured based upon the three alternative levels of net lost income described previously: $3,000 per year; $6,000 per year; or $9,000 per year.

The future net lost income is calculated by making an allowance for future increases in earnings due to inflation and productivity. However, the future net lost income must also be reduced to its present value at an appropriate rate of interest. By using rates of growth in earnings that are representative of average rates of growth in earnings in the U.S. labor market, and using interest rates that reflect current interest rates in the U.S. economy, the allowance for future growth in earnings coupled with the reduction of future net loss income their present value would be approximately equivalent to a reduction to present worth at 2% net interest. On this basis, the total amount of the future lost net income through the current date would be as follows:

|  | Net Lost Income | | |
|---|---|---|---|
|  | **$3,000/yr** | **$6,000/yr** | **$9,000/yr** |
| Work through age 55........... | $27,677 | $55,353 | $83,030 |
| Work through age 60........... | $39,208 | $78,416 | $117,624 |
| Work through age 65........... | $49,652 | $99,304 | $148,957 |
| Work through age 70........... | $59,112 | $118,224 | $177,336 |

Debbie Bailey

## LOST HOUSEHOLD SERVICES

Ms. Bailey lived at home with her three younger children at the time of her death.  Her mother, Gladys Bailey, has indicated in her deposition that "Debbie did everything" for her household and her children.  The lost household services would include cooking, cleaning, childcare, grocery shopping, errands, and handling the family finances.

According to DHEW Publication No. 78-30126, as well as information published by the U.S. Department of Labor and the American Economic Association, an employed homemaker would generally spend an average of 20 hours or more per week providing various services for her household.  For purposes of this report, the lost household services are conservatively measured based upon an average of 20 hours of lost services per week.

The lost household services are best valued at their replacement cost utilizing an appropriate value for the lost services.  An appropriate value to use would currently be $14 per hour, based upon earnings information for similar types of household workers, as published by the U.S. Department of Labor in its "Occupational Outlook Handbook" and other regional earnings data.  On this basis, and allowing for increases in the value of the lost services from the date of Ms. Bailey's death (January 19, 2003) through the current value of $14 per hour, the total past lost household services through the current date would be $37,923.

The future lost household services are measured through the time that the youngest child would reach age 21 (a future period of approximately 7 years).  The current value of the lost services would be $14,560 per year.  On this basis, and utilizing the net interest rate method, the present value of the future lost household services would be $94,232.

Debbie Bailey

## **SUMMARY**

### *Future Net Lost Income*

The Summary figures presented below include the respective amounts of Past Lost Net Income, Future Lost Net Income, Past Lost Household Services, and Future Lost Household Services.

### Net Lost Income

|  | $3,000/yr | $6,000/yr | $9,000/yr |
|---|---|---|---|
| Work through age 55 | $167,914 | $203,673 | $239,432 |
| Work through age 60 | $179,445 | $226,736 | $274,026 |
| Work through age 65 | $189,889 | $247,624 | $305,359 |
| Work through age 70 | $199,349 | $266,544 | $333,738 |

# EXHIBIT "B"

1988 WL 130411, Bradley v. Dionisi, (Del.Super. 1988)

**\*130411**    Only the Westlaw citation is currently available.

UNPUBLISHED OPINION.    CHECK COURT RULES BEFORE CITING.

Superior Court of Delaware, New Castle County.

Joseph BRADLEY and Elaine Bradley, individually and as the
Administratrix of the Estate of Nikole Marie Bradley, Plaintiffs,
v.
Louis G. DIONISI and John P. Denis, Defendants.
Submitted:  July 20, 1988.
Decided:  Nov. 17, 1988.

On Defendant Dionisi's Motion for Partial Summary Judgment.  Granted in Part; Denied in Part.

H. Murray Sawyer, Jr., Christopher J. Curtin, and Daniel R. Losco, SAWYER & AKIN, P.A., Wilmington, for plaintiffs.

Frank J. Miller, MILLER & FOULK, Wilmington, for defendant Dionisi.

*ORDER*

**POPPITI**, Judge.

**\*\*1** This 17th day of November, 1988:

Upon consideration of the record before the Court and the contentions of the respective parties in their submitted briefs, it appears to the Court that:

1. The defendant Louis Dionisi has filed a Motion for Partial Summary Judgment on the issue of the proper measure of damages in causes of action filed under both the Wrongful Death Statute, 10 *Del.C.* § 3721 *et seq.* and the Survival Statute, 10 *Del.C.* § 3701 *et seq.*   The facts of record are not in dispute.

2. Nikole Marie Bradley, the 18 year old daughter of Joseph and Elaine Bradley (the "plaintiffs") died as a result of injuries she sustained in an automobile collision on May 2, 1985.   At the time of the collision, Nikole was a passenger in an automobile driven by Louis Dionisi.   At approximately 11:20 p.m., while a hard rain was falling, Louis Dionisi attempted to make a left-hand turn across the northbound lanes of Philadelphia Pike into the Club

Avenue Apartments.   The Dionisi vehicle was struck on the right side by a pickup truck driven by the defendant, John Denis.   Nikole was pronounced dead on the operating table at Wilmington Hospital at about 3:00 p.m. on May 3, 1985.

3. The claims of the Estate pursuant to the Survival Statute include, *inter alia,* a claim for lost future earnings.   The claims of the beneficiaries pursuant to the Wrongful Death Statute include, *inter alia,* a claim for the deprivation of the expectation of pecuniary benefits that would have resulted from Nikole's continued life.   In this regard, plaintiffs have retained an expert who has opined that the total loss to Nikole's estate reduced for maintenance expenses as well as for present day value to be between $224,772 and $236,840.

4. The first question becomes, can a personal representative in a survival action recover for the loss of earnings of the decedent beyond death?   I am satisfied that the answer is in the negative.

I had occasion to rule on this very question in the matter of *Robert Shively, et al. v. Gershon Klein, et al., Del.Super., C.A. No. 84C-JL-112 (September 9, 1986).   Therein I held that:*

When a person dies, two distinct causes of action may exist.   First, there is a "survival action" under 10 *Del.C.* § 3701 which allows a personal representative of the decedent to substitute as plaintiff in an action which might have been brought by the decedent "to recover damages for injuries to the person" had he survived.   Damages in a survival action would thus include pain and suffering and loss of income due to the injury up to the time of death.   *Magee v. Rose,* Del.Super., 405 A.2d 143, 146 (1979);   *Coulson v. Shirks Motor Express Corp.,* Del.Super., 107 A.2d 922 (1954).

Nothing contained in the briefs in support of the defendant's motion convinces me that my ruling in *Shively* is in error.

5. The second question becomes, can the beneficiaries as defined by the provisions of the Wrongful Death Statute recover for the loss of future earnings of the decedent?   I am satisfied that the answer to this question is in the affirmative.

**\*\*2.** Once again, I had occasion to rule on the issue in *Shively, supra.*   Therein I explained that an action for wrongful death is an action on behalf of:

© 2005 Thomson/West. No claim to original U.S. Govt. works.

1988 WL 130411, Bradley v. Dionisi, (Del.Super. 1988)                    **Page 2**

... the 'wife, husband, parent and child of the deceased person.'   Its purpose is to 'fairly compensate for the injury resulting from the death.' 10 *Del.C.* § 3724(d).  Under its predecessor statute, this action was limited to pecuniary loss occasioned by death.'  [ *Magee v. Rose,* 405 A.2d 143, 147.] The purpose of the new statute, ... is 'to permit the recovery of damages not limited to pecuniary losses by persons injured as the result of the death of another person.'  10 *Del.C.* § 3725.  The statutory language does not, in my view, in any way diminish the amount of pecuniary damages allowed in a Wrongful Death action.  Thus it is still settled law that:

... the recovery of an action for the wrongful death of a child of tender years is the jury's estimate of the value of the estate the child probably would

have earned, saved and left to his next of kin at the end of his life expectancy.  This sea of pure conjecture may be otherwise described as the jury's estimate of the present money value of the child's life to the estimated prospective estate of the child. *Cann v. Mann Constr. Co.,* Del.Super., 93 A.2d 741, 743 (1952).

Nothing contained in the briefs in support of the defendant's motion convinces me that my ruling in *Shively* is in error.

6. For the reasons stated above, defendant's Motion for Partial Summary Judgment is HEREBY GRANTED IN PART and DENIED IN PART.

IT IS SO ORDERED.

© 2005 Thomson/West. No claim to original U.S. Govt. works.